GoDaddy.com, LLC v. Rpost Communications Limited Mr. Hudnell. Good morning, your honors. May I please the court. My name is Lewis Hudnell. I represent the Rpost appellants in this matter. We are asking the court to vacate the district court's order granting summary judgment as the district court committed multiple errors in determining that the six patents in suit were ineligible under section 101. At step one of the Supreme Court two-part test, the district court applied a heart of the claims test, which was rejected by the Supreme Court nearly 60 years ago and oversimplified the claims to conclude that they recite nothing more than data regarding the delivery of an email. This error caused the court to fail to recognize that the claims recite features that render them patent eligible. Specifically, with respect to each of the five Tomcow patents in suit, they claim a technical solution to the technical problem of providing verifiable evidence of email delivery. That solution fits what this court has deemed patent eligible in DDR, BASCOM, and AMDOX. The problem addressed by the Tomcow patents can be seen in the appendix A5740, and for reference, since the Tomcow patents have the same specification, I'll use the 913 patent for reference. But beginning in column 2, around line 17, the Tomcow patents describe the problem of the prior art proof of email delivery systems. First, there were systems that required special software at the sender and recipient in order to prove delivery of an email. Second, there were systems that require the sender to send an email to a third party and then the recipient would have to contact a third party to retrieve the email in order to get it. The Tomcow patents solved this problem in the prior art two ways. First, they tasked the intermediate server between the sender and the recipient with the task of proof of delivery of the email. In the first group of Tomcow patents, the 913, 389, and 199, they all recite the same limitation of recording a portion of the transport protocol dialogue between the intermediate server and the recipient. By recording that dialogue and then providing that dialogue back to the recipient, the second group of Tomcow patents also solved the problem in a different way, which incidentally shows that these solutions are not preemptive because there are multiple ways to do it. The second group of Tomcow patents, the 104, 198 patents, provide for the intermediate server adding a configurable link to the email such that when the recipient receives the email and opens the email, that link will cause the server to provide an indication that the messages have been opened or delivered. Now that was in the prior art, I take it. The link that proves delivery. Links were in the prior art. Indication of delivery or failure to deliver. I gather that was also in the prior art. I'm sorry? That was also in the prior art, the indication of delivery. There were different ways to do it, Your Honor. So for example, in column one of the reference patent here at A5740, around line 43, it talks about a solution where the sender could actually request a notification and receive an email back from the recipient saying that he actually got the message. The problem with that solution was that that email notification could be forged or altered. So by providing the link, Your Honor, that eliminated, one, that solved that solution because now you're relying on the intermediate server to do that. But secondly, it eliminated the cooperation of the recipient in needing to confirm that they actually received the email. Both of these solutions described in the TomCow patents were non-conventional and we know this for two reasons. First, as discussed at A5745 of the reference patent, column 11 lines, beginning around line 41, the patent talks about the typical transmission of email, which is transmitting email from MTA, mail transfer agent, to mail transfer agent on its way to the recipient. What this column of the patent discusses is in order to prove delivery, what one of the embodiments disclosed in the patent tries to do is to establish a direct connection with the mail server of the recipient. That is different than the routine transmission of the email. By establishing that direct connection with the MTA of the recipient, you see at the top of column 12, at the top it says that every successful delivery direct to a recipient mail server will always generate SMTP record. So once you have that record, once you record that record and provide that record back to the recipient, you now have proof that that email got there. Can you give me the reference that you were just citing, the appendix page? Sure. A5745, column 12, beginning around line 7. But this record wasn't something new, right? Are we talking about the protocol dialogue? Yes, the protocol dialogue was not new. Recording it was not conventional. So in the typical transmission of an email from... So the record existed, but the idea was that you recorded it in the intermediate server? Well, I don't know if it's fair to characterize it as a record. So the way SMTP works is that there's... Information. The information exists. There's... When an email is transferred, there's a data transmission step. The server will say, I'm transmitting data, there's a code for that. When that data, that email is transmitted, what was returned back is an OK that says, I've received the email. And that's the dialogue? That's the dialogue. Yes, the command saying... All components of that constitute the dialogue, I take it? I'm sorry? All components of that constitute the dialogue. So what you're saying is you take a piece of that entire dialogue and you shoot it back to the intermediate and that's your proof of delivery? Correct. And just to be clear, the dialogue could have many other steps. Understood. It's just the step where the email is actually transmitted. There's a command that sends the data. There's a command that says, OK, I got the data. For pre-existing systems of proof of delivery of emails or proof that the email did not go through, were those prior art systems using the protocol dialogue? There actually is one system that's discussed in the patent. Actually, it's discussed a little bit in the column that I was just referencing. There's an ESMTP dialogue that could be used to provide proof of delivery. But what that did is that actually provided a notice, an email back to the intermediate server saying that the email was delivered. The problem with that solution is, one, not all MTAs used ESMTP at the time. And two, if they did use it, that feature was optional. And so it wasn't always passed back. So as this part of the patent discusses, the only sure-fire way to ensure that you could get proof of delivery, which was the recognition of the inventors by recording that data transmission step from the ESMTP dialogue. So the invention then, the novelty is converting what was optional into what is mandatory? I wouldn't say that, Your Honor. I would say it was, one, recognizing that the intermediate server was the focus point, was the device that needed to be tasked with doing this. But I thought you said a moment ago that the prior art used an intermediate server for the optional return of the dialogue. There would be intermediate servers involved in that, yes. So I guess what I'm trying to figure out is, what is the inventive concept? One could argue that the alleged inventive concept here is the idea of taking this pre-existing information that was existing in the email dialogue and introducing an intermediate third party into the network and notarizing that information when it got sent back to the sender. That's, to me, one way of understanding how all these claims operate and what your novelty was in reading through the disclosures of the patents. Well, I think we need to be clear on whether we're talking about novelty or eligibility. And we're talking about eligibility. Right, but I guess what I'm trying to figure out is, what is the inventive contribution? Maybe that's another way of putting it. What is the twist in these patents that the inventors tried to come up with and then claim? And obviously the point was to create some system that verifies this information that's floating back and forth between servers. And so the invention was, let's put an intermediate server in there that's going to handle and interrupt this information flow back and forth and put some kind of notarization on top of it so that it would have some legal effect in courts. And that's kind of how I read the claims, so I'm trying to figure out, okay, does that count, though, under Alice, step two, as an inventive concept? I think it does count as an inventive concept, your honor. And I think Is that description correct? We're talking about recording pre-existing information. There is no dispute that the mail servers communicate with each other to I'm trying to understand whether you're agreeing with Judge Chin's description of this and my description of it. The information was pre-existing, the dialogue information was pre-existing, and the invention is recording it at an intermediate server? The dialogue information was pre-existing to communicate the email. The twist is recording it so that it can be used, the twist is recording it which was non-conventional so that it can be used to prove delivery of that email. The use of the communication dialogue is simply used to communicate the email back and forth between the intermediate server and the recipient. The twist is then recognizing that if I record a piece of that which was not a conventional step, recording that and sending that back to the sender. As evidence that it was a non-conventional step, the second piece of evidence that shows that this was a non-conventional step comes from GoDaddy's expert himself. In a related case involving the parent application to the TomCow patents, in this case the 372 patent, which has the same limitation of recording a transport dialogue, I asked him what is your understanding of the 372 patent? This is on A6472, beginning of line 17. I asked him what is your understanding of the claimed invention of the 372 patent? And then I asked him, did you find any references that teach the claimed invention of the 372 patent under your understanding? And then he said, under my understanding, again, I didn't look because I knew the accused products don't keep track of the mail dialogue. In fact, nobody reasonably would audit that in a product because you generate so much data. It's not really practical to do that. Next question. Why is that not practical? Because you generate so much audit data, it's not going to help you. When you're providing a mail notary service, the details of the protocol dialogue are not necessarily important, not nearly so as digitally signing and time stamping appropriately. So you're into your rebuttal time. Do you want to say that? Yes, I do. Thank you. We'll give you 10 minutes. Mr. LaCourte. Good morning. May it please LaCourte. I'm Brian LaCourte, joined by John Talcott. We represent GoDaddy. I'll address the fundamental issue in this appeal, the Section 101 ineligibility of the mail. Why don't you address the last argument that was made, that the recording of this dialogue is an inventive concept? I will. The recording of pre-existing dialogue, storing it, retrieving it, reporting it, is not an inventive concept. It is precisely, essentially, what the post office does with registered mail. It is taking pre-existing standard public protocol that was available since 1982 and simply selecting a vaguely defined portion of it to store it and then utilize the indications it provides, such as an email being delivered or bounced. Is that a 103 argument? So there is a concern about obviousness and novelty leaking into the 101 eligibility. I agree with opposing counsel that this is about 101 eligibility and not novelty. What is known and conventional in any email infrastructure is SMTP protocol. Email servers are, by nature, intermediary. They are displaced from the email client. They contain dialogue, records or logs of dialogue that clearly show the transmission trail of an email. When an email bounces, there is a code and there is an indication that it was not delivered and the email client receives from the email server that information, which of course is stored and indicates to the end user what happened. This is pre-existing you are talking about? Yes. This is decades old available protocol that, by its nature and design, is to indicate and authenticate what happened in email transmissions. So the protocol told the sender whether the message had been received? The protocol certainly tells the sender when the message bounced. The protocol is available in the email server architecture to show the transmission from point A to point B. The inventive concept at issue with our post contentions is that storing that or retrieving it is somehow an inventive concept that saves the patent under step two from ineligibility. Certainly information was stored about the transmission status of a message and post SMTP, that information, of course, is stored in some fashion as part of the logs that are part of the mail transportation. Is the point here that they are saying that what is unique is storing it on the intermediate computer? That is their argument. I would simply respond, Your Honor, that that is not an inventive concept. An intermediary is as basic and non-inventive as a... So the argument is that storing it on the intermediate computer instead of having it come back to the sender and having it available on the sender's computer. Am I understanding correctly? I believe that is our post's position and that inventive concept of simply, or alleged inventive concept of simply storing pre-existing data that is designed to indicate what our post says it indicates does not... They basically interrupt the dialogue, intercept a relevant portion, and then not only store it there at the intermediate server, but then they package it with perhaps something called an indication or authenticable information, and then sends that on to the sender. And now we have this intermediary, as you put it, that can guarantee and verify the actual transmission, the actual transaction that had occurred in the sending of the email from the sender to the recipient. To be clear, Your Honor, on that particular point, in looking at the claims language of the 913 patent rather than the lawyer argument about this intermediary server in the Tom Tao patents that does not require the cooperation of the sender or the recipient, the claims language of the 913 patent does not precisely mention an intermediary server that avoids the cooperation of the email recipient. So looking at the claims of 913, I would suggest to you, Your Honor, that they're broader than what you just described. I guess I was referring to other claims, dealing with lots and lots of claims. Yeah, there is some question about what the representative claims here would be, but certainly in the representative claims of all five of the Tom Tao patents, there is no particular reference in the district court's thoughtful analysis of this issue is certainly helpful in this framework. There is no particular reference to this intermediary server that avoids the cooperation of the in terms of their limitations are vague notions of pulling some portion of SMTP protocol that would indicate something, and that is what SMTP protocol does. That's what servers do, whether it's an email server or an intermediary server on top of an email server, and simply recording that information because it's useful is akin to the one-on-one ineligibility data gathering categorization cases that this court has decided in numerous instances, including one similar to this in IVV Symantec. There there was a server that does what servers do. It was in essence an electronic post office. The court analogized the email functionality of the claims as essentially a corporate mailroom. It grabbed tags and codes and information and reported when there was an email filtering issue or a potential virus, and the court laid out in detail in IVV Symantec how that is under step one and two, patent ineligible, is very similar to the basic functional claims as to SMTP protocol in the Tom Tao patents. If you turn to a specific patent, the 104, I'm interested in your reaction to why it is, I'll summarize that patent, the claim one, let's take it, that's one of the claims of issue as saying effectively that you add a link to the message at the server and then you transmit the message with the link and the link is what tells you that the message was opened. Now that sounds like, that may be invalid based on the prior art, but why is that abstract? Why is that 101 as opposed to 102 or 103? Fair question, Your Honor. First of all, of course, links are ubiquitous in the internet, modern internet world. Adding a link to content, whether it's a message or a website to allow someone to navigate and access content is ubiquitous. In internet patents, this court analogized a link as allowing an icon to be clicked and an online form to be populated or at least presented as an example of generally claiming a link for what it does. In the 104 patent, that is what claim one, for example, does. It simply is the addition of a link to a server as part of the email transmission that is configured to download or be active so that when the link is accessed, it indicates the link was accessed without anything more in the claims. In an abstract step one analysis, it is simply calling out, as the district court analyzed, the function of a link for what the link does without more. Certainly, the concept of a link is... Suppose there had never been links before and this was the first time anybody thought of using a link. This wouldn't be a 101 problem, would it? In this case, it is because it is... Take my hypothetical that the idea of a link was brand new. The 104 claim one that you just described, it seemed to me you were relying on the fact that this is all very conventional as opposed to that it is just abstract. I would call it abstract in this context even assuming that this patent considers links for the first time for its intended purpose. The 104 patent and the common specification for TomCow calls out tags and flagging as a pre or non-link fashion of identifying something about the email being accessed. For example, a read receipt in Microsoft Outlook as referenced in the specification. Tags and flags to indicate someone has accessed content in an email or electronic environment is well-established and conventional and if the link is simply a generic internet protocol addition to, in effect, bring to email, and I'm not suggesting this is the case because links were used before this, but to bring to email some type of indication from accessing web content, that's abstract. I would have thought you would have focused on the limitation that is in the claim one of the 104 providing an authenticatable information relating to the message including the indication of the opening as being where this became abstract, that claim one. I may have focused on the hypothetical of the links being ... Your Honor, a link does what it does. It provides some indication that may be authenticatable that someone accessed the link and that's why I mentioned the internet patents case because it seems to be the court's same concern in that case that simply using a link to do what it does and its very function would indicate or authenticate exactly what the patentee, TomCow, is claiming in claim one that does what it does, so to simply use internet hyperlink protocols which indicate something when a link is accessed as either invented concept or non-abstract material is incorrect ... The problem with the TomCow patents is this broad functional reference of indications that result from certain things that happen within internet infrastructure or email infrastructure is not patentable subject matter. To simply recite the functional steps of how email works and its underlying protocols and what is indicated by those protocols occurring is the 101 fatality for the TomCow patents. There is nothing invented in every ... The 104 patent, the executing the link step. Who or what is executing the link when the message is opened? Is that the individual that receives the email or is it the recipient's server that's automatically executing the link? At least in the record, the district court construed the term link in its plain and ordinary meaning and in the fashion that this appears to be configurable or configured to execute, it is either automatically when it is received by the email recipient's email server or accessed or clicked by the actual recipient. It says when the message is opened. It can't just simply be when the email arrives at the server. There was some debate below about what is opened and does that mean that it is accessed and viewed by a human being or landing at the server and the plain and ordinary meaning of that claim language, I would agree, Your Honor, would be someone has to either activate the link or has a setting on their email client that allows automatic downloading. At least under the plain claim terms, the link is activated at the recipient's server by some function, typically the recipient. Again, just returning to the lack of inventive concept, anytime someone accesses the link and related web content and navigates to a webpage, there are footprints, there are indications that result from that. That is the sort of generic result of hyperlink protocols and to simply collect that and use it for its indication is neither inventive nor patentable subject matter. I have only 30 seconds left. I would like to address one last item with regard to the patents. Mainly in the claims language, it is generic computer technology. Time and again, this Court has said simply taking the notion as we have here of a well-established conventional concept or abstract idea and saying apply it to an email technological platform, which is what the patents do, is not enough. There has to be something more and adding a link to an email or using protocols is not inventive or enough. Thank you, Your Honors. Thank you, Your Honors. Just to pick up where my colleague left off, we completely disagree that this is simply adding a computer to perform these functions. I am still confused as to what is new here. As I understand it before, it was known to use an intermediate computer. That was conventional, right? Their intermediate servers existed, yes. As I understand it, the authentication of the delivery or opening of the email was something that was available to people before. No. We dispute that. What you said earlier that there was a way of doing this. Oh, there were other ways, yes. There were other ways. What I am trying to get at is how do those other ways differ from this way? Those other ways either required the cooperation of the recipient, they required special software at the client, or they did not always provide evidence of proof of delivery. What do you mean they did not always provide that? In the ESMTP example that I discussed earlier, in the prior art, there were servers that could do ESMTP and send an email back to the sender indicating that the message was delivered. But ESMTP was not used by all the servers for an email on its way from the sender to the recipient. So there was no surefire way that you would actually get that proof. Well, it is surefire because some of the systems did not have it. Either they did not have it. Well, that does not, I mean, it can be conventional even though it was not universal. Either they did not have it or if they had the feature, it was not turned on. But if the only thing you need to do is just flip a switch and turn it on, it is not much of a contribution to say, well, the switch should stay on all the time. The recognition here, Your Honor, or the twist is recognizing that instead of using that system, we are going to use a system where we record a portion of the ESMTP dialogue and provide that back to the sender to protect the sender in the situation where the recipient says, I did not get your email. Okay. All right.  Thank you, Your Honor.